**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 4:22-md-03047-YGR<br><br>MDL No. 3047 |
| This Document Relates to:<br>SONOMA COUNTY, CALIFORNIA<br>Plaintiff v.<br>META PLATFORMS, INC., et al., Defendants.<br><br>Member Case No.: 3:25-cv-5744 | **LOCAL GOVERNMENT AND SCHOOL DISTRICT MASTER SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL** |

The Plaintiff(s) named below file(s) this *Short-Form Complaint and Demand for Jury Trial* against the Defendant(s) named below by and through their undersigned counsel. Plaintiff(s) incorporate(s) by reference the allegations, claims, and relief sought in *Plaintiffs' Master Local Government and School District Complaint* ("Master Complaint") as it relates to the named Defendant(s) (checked-off below), filed in *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, in the United States District Court for the Northern District of California. Plaintiff(s) file(s) this *Short-Form Complaint* as permitted by Case Management Order No 8.

Plaintiff(s) indicate(s) by checking the relevant boxes below the Parties and Causes of Actions specific to Plaintiff(s)' case.

Plaintiff(s), by and through their undersigned counsel, allege(s) as follows:

I.  **DESIGNATED FORUM**

1.  *For Direct Filed Cases:* Identify the Federal District Court in which the Plaintiff(s) would have filed in the absence of direct filing:

    United States District Court, Northern District of California

2.  *For Transferred Cases:* Identify the Federal District Court in which the Plaintiff(s) originally filed and the date of filing:

II.  **IDENTIFICATION OF PARTIES**

A.  **PLAINTIFF(S)**

3.  *Plaintiff(s):* Name(s) of the local government or school district alleging claims against Defendant(s):

    Sonoma County

4.  Number of schools served in the Plaintiff(s)' school district or local community:

    Approximately 162 public schools and 42 private schools

5.  Number of minors served in the Plaintiff(s)' school district or local community:

    Approximately 94,000 minors reside in Sonoma County

6.  At the time of the filing of this *Short-Form Complaint*, Plaintiff(s) is/are a resident and citizen of [*Indicate State*]:

    California

## B.    DEFENDANT(S)

7.  Plaintiff(s) name(s) the following Defendant(s) in this action [*Check all that apply*]:

### META ENTITIES

☑   META PLATFORMS, INC.,

    *formerly known as* Facebook, Inc.

☑  INSTAGRAM, LLC

☑  FACEBOOK PAYMENTS, INC.

☑  SICULUS, INC.

☑  FACEBOOK OPERATIONS, LLC

☑  FACEBOOK HOLDINGS, LLC

☑  META PAYMENTS INC.

### TIKTOK ENTITIES

☑  BYTEDANCE LTD

☑  BYTEDANCE INC.

☑  TIKTOK LTD

☑  TIKTOK LLC

☑  TIKTOK INC.

### SNAP ENTITY

☑  SNAP, INC.

### GOOGLE ENTITIES

☑  GOOGLE, LLC

☑  YOUTUBE, LLC

### OTHER DEFENDANTS

For each "Other Defendant" Plaintiff(s) contends are additional parties and are liable or responsible for Plaintiff(s)' damages alleged herein, Plaintiff(s) must identify by name each Defendant and its citizenship, and Plaintiff(s) must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

| NAME | CITIZENSHIP |
|---|---|
| Alphabet Inc. | Delaware, California |
| XXVI Holdings Inc. | Delaware, California |
| Facebook Technologies, LLC | Delaware, California |
| Discord Inc. | Delaware, California |
| Roblox Corporation | Delaware, California |

### III.    CAUSES OF ACTION ASSERTED

8.  The following Causes of Action asserted in the *Master Complaint*, and the allegations with regard thereto, are adopted in this *Short-Form Complaint* by reference (*check all that are adopted*):

| Asserted Against[1] | Count Number | Cause of Action (COA) |
|---|---|---|
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s)[2] | 1 | NEGLIGENCE |
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s) | 2 | PUBLIC NUISANCE |

### NOTE

If Plaintiff(s) want(s) to allege additional Cause(s) of Action other than those selected in paragraph 8, which are the Causes(s) of Action set forth in the *Master Complaint*, the facts supporting those additional Cause(s) of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

### IV.    ADDITIONAL CAUSES OF ACTION

9.  Plaintiff(s)  assert(s)  the  following  additional  Causes  of  Action  and  supporting allegations against the following Defendants:

Count III - Fraudulent Misrepresentation and Concealment against all Defendants.

Count IV - Gross Negligence (Against All Defendants)

Count V - Violation of the Racketeer Influenced and Corrupt Organizations Act (Against All Defendants)

See Attachment A: SUPPORTING ALLEGATIONS REGARDING SHORT FORM COMPLAINT AND DEMAND FOR JURY TRIAL.

---

[1] For purposes of this paragraph, "entity" means those Defendants identified in Paragraph 7 (*e.g.*, "TikTok entities" means all TikTok Defendants against which Plaintiff(s) is/are asserting claims).

[2] Reference selected "Other Defendants" by the corresponding row number in the "Other Defendant(s)" chart identified in Paragraph 7.

**WHEREFORE**, Plaintiff(s) pray(s) for relief and judgment against Defendants and all such further relief that this Court deems equitable and just as set forth in the *Master Complaint*, and any additional relief to which Plaintiff(s) may be entitled.

## **JURY DEMAND**

Plaintiff(s) hereby demand a trial by jury as to all claims in this action.

****

By signature below, Plaintiff(s)' counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of California and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

/s/ Aelish M. Baig

Name: Aelish M. Baig

Firm: Robbins Geller Rudman & Dowd  LLP

Address: One Montgomery Street, Suite 1800 San Francisco, CA 94104

Phone: 415/288-4545

Fax:

Email: aelishb@rgrdlaw.com

*Attorneys for Plaintiff(s)*

Sonoma County, California

OFFICE OF SONOMA COUNTY COUNSEL
ROBERT PITTMAN (172154)
County Counsel
JOSHUA MYERS (250988)
Chief Deputy County Counsel
575 Administrative Drive, Room 105-A
Santa Rosa, CA  95403

# ATTACHMENT A

1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  AELISH M. BAIG (201279)
   TAEVA C. SHEFLER (291637)
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  aelishb@rgrdlaw.com
   tshefler@rgrdlaw.com
6
   OFFICE OF SONOMA COUNTY COUNSEL
7  ROBERT PITTMAN (172154)
   County Counsel
8  JOSHUA MYERS (250988)
   Chief Deputy County Counsel
9  575 Administrative Drive, Room 105A
   Santa Rosa, CA  95403
10 Telephone:  707/565-2421
   707/565-2624 (fax)
11 robert.pittman@sonoma-county.org
   joshua.myers@sonoma-county.org
12
   Attorneys for Plaintiff
13
   [Additional counsel appear on signature page.]
14
                    UNITED STATES DISTRICT COURT
15
                  NORTHERN DISTRICT OF CALIFORNIA
16
                         OAKLAND DIVISION
17
   In re SOCIAL MEDIA ADOLESCENT          )   MDL Case No. 4:22-md-03047-YGR
18 ADDICTION/PERSONAL INJURY              )
   PRODUCTS LIABILITY LITIGATION          )
19                                         )
   This Document Relates To:              )   SUPPORTING ALLEGATIONS
20                                         )   REGARDING SHORT-FORM COMPLAINT
   SONOMA COUNTY,                         )   AND DEMAND FOR JURY TRIAL
21                                         )
                          Plaintiff,       )
22                                         )
             vs.                           )
23                                         )
   ALPHABET INC., XXVI HOLDINGS INC.,     )
24 META PLATFORMS, INC., DISCORD INC.,    )
   and ROBLOX CORPORATION,                )
25                                         )
                          Defendants.      )
26 _____)

27

28

4899-9761-9477.v1

## I.    ADDITIONAL ALLEGATIONS

1.    Sonoma County, California has borne painful witness to the devastating impact of social media on its youth.

2.    Like virtually everywhere in the United States now, Sonoma County's youth suffer from a high degree of distraction, depression, suicidality, and other mental disorders caused by or worsened by the overconsumption of social media on a daily basis, which substantially interferes with the rights of health and safety common to the general public.  Recent surveys indicate that fully half of Sonoma County high-school students report feeling regularly depressed, stressed, or anxious.[1] In 2024, 10% of Sonoma County high school students reported having serious thoughts of suicide.

3.    Sonoma County health employees report that the youth they serve have disturbing experiences on social media, including enduring bullying, being bombarded with posts encouraging self-harm, and being contacted by adults seeking sexual interactions.  In one instance, Sonoma County's crisis response team responded to an elementary school because a 9-year-old girl was having suicidal thoughts after she was bullied on a YouTube "hate page."  In another instance, a Sonoma County youth behavioral health client recounted that an adult male told her that he "would definitely rape [her]," among a slew of other sexual comments.  Yet another youth client, after expressing thoughts about suicide, was offered a gun for purchase on SnapChat as a means to follow through on his plan.  Still others report accessing drugs through social media.

4.    As a result, Sonoma County health workers regularly respond to youth experiencing mental health crises that arise from social media.  For example, the crisis response team intervened when a 16-year-old girl physically attacked her mother because her mother had taken away her access to social media.  Sonoma County behavioral health workers report that youth often become distraught over access to social media, with some expressing suicidality as a result.

5.    In summary, social media has had a profound, direct effect on youth behavior, and as a result has shaped Sonoma County's health programming.  To address these issues, Sonoma County

---

[1]    Youth Truth Survey, Sonoma County Schools – High Schools – "Student Survey" District Report – No School Seg – January 2024 (Feb. 4, 2025), https://youthtruth.surveyresults.org/reports/print/5c47e98d1a666d0eaf4e.

has shifted its behavioral and public health strategies, adapted its policies, and made new investments in staffing and outreach. These shifts have included increasing funding for youth mental health services, including therapy, case management, crisis intervention and stabilization, rehabilitation and medication support for children and youth to age 18, mobile crisis units, and extensive in-school mental health programming and trainings to address youth mental health specifically. The need is that great.

## II.    THE PARTIES

### A.    Plaintiff

6.    Plaintiff the County of Sonoma ("Sonoma County") is a political subdivision of the State of California, organized and existing under the laws of the State of California, specifically Government Code §23000, *et seq.* The Clerk of the Board of Supervisors for Sonoma County is located at 575 Administration Drive, Room 105A, Santa Rosa, California. Sonoma County has the power to enter into contracts and sue and be sued. Cal. Gov. Code §23004. Sonoma County has an overall population of around 500,000 people, with approximately 78,932 residents in Sonoma County aged 5-19 years old.[2]

7.    Sonoma County brings this action on its own behalf.

### B.    Additional Defendants

8.    Defendant Alphabet Inc. ("Alphabet") is a Delaware corporation with its principal place of business in Mountain View, California. Alphabet is the sole stockholder of XXVI Holdings Inc.

9.    Defendant XXVI Holdings Inc. is a Delaware corporation with its principal place of business in Mountain View, California. XXVI Holdings Inc. is a wholly-owned subsidiary of Alphabet and the managing member of Google LLC.

10.    Defendant Meta Platforms, Inc.'s ("Meta" or "Company") subsidiary, defendant Facebook Technologies, LLC ("Facebook Technologies"), was organized under the laws of the State

---

[2]    U.S. Census Bureau, U.S. Department of Commerce, "Age and Sex," *American Community Survey, ACS 1-Year Estimates Subject Tables, Table S0101*, 2021, https://data.census.gov/table/ ACSST1Y2023.S0101?q=Sonoma%20County,%20California (last visited Feb. 4, 2025).

1   of Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014.

2   Facebook Technologies develops Meta's virtual and augmented reality technology, such as the Meta

3   Quest line of services, among other technologies, related to Meta's platforms, and its principal place

4   of business is in Menlo Park, California.   Defendant Meta is the sole member of Facebook

5   Technologies.

6          11.    Defendant Discord Inc. ("Discord") is a Delaware corporation.  Its principal place of

7   business is in San Francisco, California.  Its primary product, a social media platform called Discord,

8   was launched in 2015 and is widely available throughout the United States.

9          12.    Defendant Roblox Corporation ("Roblox") is a Delaware corporation with its

10  principal place of business in San Mateo, California.  Roblox launched its eponymous online gaming

11  platform in 2006, which is widely available to users throughout the United States.

12         **C.    Additional Allegations Relating to Defendant Discord**

13         13.    Discord is an instant messaging and social media platform that allows for users to

14  communicate with each other through private and group-based messaging, including through text,

15  photos, videos, and video calls.  It can be likened to a series of chat rooms and groups in which users

16  can engage in conversation with others.  It was launched in 2015.  As of January 2024, the platform

17  had more than 196 million active users each month.[3]  As noted by co-founder and CEO Jason Citron

18  at the January 31, 2024 Congressional hearing, more than 60% of Discord's active users are between

19  the ages of 13 and 24 years old.[4]

20         14.    Discord generates revenue through user subscription fees that gives users access to

21  features like custom emojis for $5 or $10 per month.  Discord also generates revenue through access

22  to its server, of which the company takes a 10% cut.[5]

23
24  [3]   Werner Geyser, *The Latest Discord Statistics: Servers, Revenue, Data, and More*, Influencer
    Marketing Hub (Jan. 30, 2024), https://influencermarketinghub.com/discord-stats/.

25  [4]   Adi Robertson, *Meta, TikTok, and other tech companies go to Congress: all the news*, Verge
26  (Jan. 31, 2024), https://www.theverge.com/2024/1/31/24056136/congress-child-safety-hearing-kosa-
    meta-x-discord-snap-tiktok/archives/2.

27  [5]   Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young
    People*, N.Y. Times (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/business/discord-server-
28  social-media.html.

15. Discord has designed, developed, produced, operated, promoted, distributed, and marketed its platforms to attract, capture, and addict youth, with minimal parental oversight. Not only are Discord's features engineered to induce compulsive use by young people, it has also failed to reasonably protect child users and help limit and prevent child sexual exploitation, sextortion, and distribution of known Child Sexual Assault Material ("CSAM") by failing to implement certain design features that prioritize children's safety.

16. Discord has designed and operates its product in such a way that it also allows people to chat using fake names; and the task of enforcing community standards is largely delegated to the organizers of individual Discord groups, called "servers."[6] By default, all users – including users under 18 years old – can receive friend invitations from anyone in the same server, which opens the ability for them to send and receive private messages from strangers.[7]

17. Discord's dangerous and harmful design features include, *inter alia*, a lack of reliable age verification to determine users' ages; failure to implement effective parental controls; failure to implement effective parental notifications; failure to enable default protections for youth in order to protect against compulsive use or overuse of the product; and a lack of community safety precautions to prevent adults from preying on children, such as false assurances that certain features will keep users safe and downplaying the dangers of its product to youth users.

18. Discord's terms of use prohibit users under 13 years old ("u-13"), but Discord does not verify user age or identity. There is no parental notification to parents when a youth user signs up for a new account. Discord's failure to effectively verify age puts it in violation of the Children's Online Privacy Protection Act of 1998 ("COPPA").[8] COPPA regulates the conditions under which platforms like Defendants' can collect and use the information of children under 13. COPPA

---

[6] *Id.*

[7] Samantha Murphy Kelly, *The dark side of Discord for teens*, CNN Bus. (Mar. 22, 2022), https://www.cnn.com/2022/03/22/tech/discord-teens/index.html.

[8] *See* 15 U.S.C. §§6501-6506.

1    requires platforms that either target u-13 users or have actual knowledge of u-13 users to obtain

2    "verifiable parental consent" prior to collecting and using information about them.[9]

3         19.     Discord has failed to implement a robust and effective age verification process, and

4    knows that there are u-13 users using the product.  In fact, Discord is aware that children as young as

5    eight years old are currently using the product.[10]  Discord has access to information within its

6    platform to identify the age of its users because youth users often state their real age in their bio

7    and/or tell other users their real age in group and private chats using one or more Discord product

8    features.  Youth users also post photos that often reflect their actual age.

9         20.     In many cases, youth users are able to access Discord throughout the school day

10    because it is not one of the applications that is blocked on school networks, such as Snapchat and

11    Instagram.[11]

12         21.     Discord has failed to implement safety features such that there is an unreasonable

13    opportunity for and risk of sexual exploitation of youth on the platform.  By default, all product users

14    – including users under 18 years old – can receive friend invitations from anyone in the same server,

15    which opens the ability for them to send and receive private messages from strangers.[12]  Discord has

16    failed to implement effective parental controls to prevent such activity from causing harm to youth.

17    Discord has failed to implement effective tools for youth/parent users to choose to avoid such

18    problematic and harmful experiences.

19         22.     Discord's purported "safety" features create a false sense of security on the platform,

20    which create an unreasonable risk of harm to youth.  For instance, until in or around October 2023,

21    the Discord support pages described the platform's "Safe Direct Messaging" options in the following

22    ways:

---

[9]    *Id.*

[10]    Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young People*, N.Y. Times (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/business/discord-server-social-media.html.

[11]    Samantha Murphy Kelly, *The dark side of Discord for teens*, *supra* note 8.

[12]    *Id.*

- **Keep me safe**: the safest option.  This will have Discord scan any image sent in all DMs, regardless of whether you've added the user on your friend list, or the user is DMing you just by sharing a mutual server.

- **My friends are nice**: The medium-est option!  This will let Discord know to scan any images sent in DMs from users that aren't on your friends list, but also to trust your previously-added friends and not worry about any images they send.

- **Do not scan**: The self-confident option.  Enabling this option will completely disable Discord's image scanning process, and leave you for a walk on the wild side for any and all DMs you receive.  Careful, it's a jungle out there!

23.     These representations reasonably would lead youth users to believe that Discord will scan for and block sexually explicit materials, including materials used to groom and/or blackmail youth users.  Discord should not be offering less-safe options ("My friends are nice" and "Do not scan")[13] to youth users without parental consent.  The less-safe options as product features are further defective and/or dangerous for youth users because they downplay the risks of sexually explicit and/or otherwise harmful content through direct messaging, with descriptions such as "the wild side" and "a jungle," and suggesting that the "Do not scan" option is "The self-confident option."  This creates a false sense of security that results in direct harm to Discord's youth users.

24.     Further, the safe messaging features do not operate as promised.  The "Keep me safe" option, as described, would reasonably lead a youth user to understand that Discord's scanning service would keep them "safe" from predatory users and sexually explicit and/or otherwise harmful content.  However, Discord's safety scanning service did not do even that.  This option filters explicit context received in direct messages only, not those received through group messaging.[14] The viewing and trading of CSAM is rampant via Discord.[15]

---

[13]   *Id.*

[14]   Letter from Patrick Trueman and Dawn Hawkins, End Sexual Exploitation, to Jason Citron, CEO of Discord, April 26 2023, https://endsexualexploitation.org/wp-content/uploads/Discord-Notification-Letter_DDL-2023_FINAL_Redacted.pdf.

[15]   *Id.*; *Afraid, Uncertain, and Overwhelmed: A Survey of Parents on Online Sexual Exploitation of Children*, Parents Together Action (2023), https://parentstogetheraction.org/wp-content/uploads/2023/03/PT_PDF_final-2.pdf.

25.     Discord's complete lack of parental controls also presents an unreasonable risk of harm to youth users.  This allows youth to use the platform and be exposed to the risks of trauma, abuse, grooming, and exploitation through use of the product, all under the false impression that Discord is taking affirmative action to keep the users safe.

26.     Youth users on Discord are exposed to sexual predators, who contact them over the platform, cultivate emotional connections, and engage in "grooming" in order to exploit, manipulate, and abuse such youth users.[16]  Youth are exposed to self-harm chats, including shared tips on how to hide cutting and other self-harm from parents, and suggested advice on how to run away from home (in at least one reported instance to meet up with an adult met through the platform).[17]

27.     Discord does not provide effective warnings to youth users or parents regarding the unreasonable risk of harm to youth in using the product.  It makes it difficult for parents or other visitors of the platform to report CSAM, other inappropriate or harmful content, or predatory user accounts without needing to either log into the platform or have significant information only obtainable from the platform.

28.     Discord has additional product defects that encourage compulsive use and overuse of its product.  For instance, Discord does not provide an option to users to self-restrict time on the platform.

29.     Youth lack the cognitive ability and life experience to identify online grooming behavior by adults and the psychosocial maturity to decline invitations to exchange sexually explicit or otherwise salacious or violent material and mass-messaging capabilities.  At all relevant times, Discord allowed direct messaging with and by youth without parental notification.

30.     In 2023, Discord finally began to implement additional safety features for youth.  In July 2023, Discord launched a Family Center that allows for limited parental monitoring of youth

---

[16]     *See* Dee Dee Gatton, *Discord app raises safety concerns as experts warn of sexual exploitation risks*, 24 News (June 22, 2023), https://nbc24.com/news/nation-world/discord-app-raises-safety-concerns-as-experts-warn-of-sexual-exploitation-risks-the-national-center-on-sexual-exploitation-purdue-university-dr-kathryn-seigfried-spellar-chat-app-grooming-social-media-platform; Samantha Murphy Kelly.  *The dark side of discord for teens.*

[17]     Samantha Murphy Kelly, *The dark side of Discord for teens*, *supra* note 8.

users' activities on Discord.[18]  This program is "opt-in," which means youth must choose to include their parents in the Family Center in order for it to be effective.  In October 2023, Discord launched the "Teen Safety Assist" initiative to attempt to address some of the risks to youth users.[19]  Two of the new features include a safety alert to a teen user when a teen user receives a direct message from a user for the first time and a content filter that automatically blurs sensitive content received through a direct or group message.[20]

31.     Discord's defective and harmful product features present unreasonable risks of harm to youth users and have directly harmed youth users.  Because Discord allows fake usernames, does not verify age, does not facilitate parental controls, and misleads users to believe that there is a "safe" messaging option, youth have been groomed, exploited, and abused by other users through Discord without protection, as well as exposed to harmful content, such as self-harm and violent material.[21]  Discord enables sexual predators to text, call, and video chat with youth users and prey on their vulnerabilities.

32.     Without the appropriate safety features for youth, youth users have found their way to chat rooms that share information about self-harm or eating disorders, have been subjected to sexual exploitation and manipulation by sexual predators, and have had exploitative content shared via Discord's servers.[22]  A June 2023 report found that since Discord's launch, at least 35 criminal

---

[18]  *Stay Connected with Your Teen Using Discord's Family Center*, Discord Blog (July 11, 2023), https://discord.com/blog/discord-family-center-stay-connected-with-your-teen.

[19]  *How We're Making Discord the Best Place to Hang Out and Have Fun with Your Friends*, Discord Blog (Oct. 19, 2023), https://discord.com/blog/best-place-to-hang-out-with-friends.

[20]  *Id.*

[21]  Samantha Murphy Kelly, *The dark side of Discord for teens*, *supra* note 8; Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young People*, N.Y. Times (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/business/discord-server-social-media.html.

[22]  Samantha Murphy Kelly, *The dark side of Discord for teens*, *supra* note 8.

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL - MDL Case No. 4:22-md-03047-YGR
4899-9761-9477.v1

- 8 -

1    prosecutions involving charges of kidnapping, grooming, or sexual assault and 165 prosecutions

2    related to child sexual abuse included communications using Discord.[23]

3        33.    Discord's own transparency reports reveal that it received over 416,000 reports

4    related to child safety from October 2023 to December 2023 alone.[24]  It also received over 895,000

5    reports for exploitative and unsolicited content.[25]

6        34.    Discord's design features and conduct facilitating the abuse of youth and exacerbating

7    the spread of CSAM have caused Plaintiff to divert and increase resources and expenditures to

8    provide education, counseling, disciplinary, and other social services to harmed youth.

9        **D.    Additional Allegations Against Defendant Roblox**

10       35.    Roblox is an online gaming platform officially launched by Roblox Corporation in

11   2006.  The company describes its product as a "virtual universe" in which users can create and play

12   games, engage with other users, and take part in other online experiences.  The website claims:

13   "Roblox is free to play and safe for kids aged 4+."

14       36.    Roblox restricts certain games and experiences to 13-plus users.  However, at

15   registration, users self-report their age and there is no age verification requirement to create a 13-

16   plus account.  Therefore, any user can input a date to reflect an age over 13.[26]

17       37.    Roblox reports 79.5 million daily active users, including more than half of all

18   American children under 16.[27]  Forty percent of users are preteens.[28]

19   ─────────────────────

20   [23]   Ben Goggin, Child predators are using Discord, a popular app among teens, for sextortion and abductions, NBC News (June 21, 2023), https://www.nbcnews.com/tech/social-media/discord-child-safety-social-platform-challenges-rcna89769.

21   [24]   Discord, *Transparency Reports* (Jan. 16, 2024), https://discord.com/safety-transparency-reports/2023-q4.

22

23   [25]   *Id.*

24   [26]   *Roblox: Inflated Key Metrics For Wall Street And A Pedophile Hellscape For Kids*, Hindenburg Research (Oct. 8, 2024), https://hindenburgresearch.com/roblox/.

25   [27]   Taylor Lyles, *Over half of US kids are playing Roblox, and it's about to host Fortnite-esque virtual parties too*, The Verge (July 21, 2020), https://www.theverge.com/2020/7/21/21333431/roblox-over-half-of-us-kids-playing-virtual-parties-fortnite.

26

27   [28]   Olivia Carville and Cecilia D'Anastasio, *Roblox's Pedophile Problem*, Bloomberg (July 22, 2024), https://www.bloomberg.com/features/2024-roblox-pedophile-problem/.

28

38.    Roblox encourages users, including kids, to spend money on in-game purchases.[29] Users purchase Robux [Roblox currency] to then pay for virtual goods or experiences within the game, including the ability to personalize their virtual avatars with unique clothing or styles.  In the EU, Roblox faces a government complaint over tricking young players into spending money.[30]

39.    Roblox went public via direct listing in 2021.  Roblox is not profitable; rather, its stock price is buoyed by the platform's potential advertising revenue given the size of its user base and the hours they spend online.[31]  As such, to maximize potential profit, the game is designed to keep its users, including children, engaged for as long as possible.

40.    Roblox is ubiquitous among children.  The company reports that nearly 75 percent of American children ages 9 through 12 regularly play Roblox with friends.[32]  A December 2017 study reported that young children – ages 5 to 9 – spent more time playing Roblox than any other online computer activity.[33]  For children ages 9 through 18, Roblox came second to only YouTube.  These numbers skyrocketed during the Covid-19 pandemic.[34]

41.    Roblox, with its chat functions and interactive games, is a *de facto* social network for children.  Roblox markets its product specifically to children and their parents.  For example, Roblox

---

[29]    Katherine Latham, *How computer games encourage kids to spend cash*, BBC (May 15, 2023), https://bbc.com/news/business-65372710.

[30]    Foo Yun Chee, *Videogame firms hit with EU complaint over 'tricking consumers,'* Reuters (Sept. 12, 2024), https://www.reuters.com/technology/videogame-firms-hit-with-eu-complaint-over-tricking-consumers-2024-09-11/.

[31]    Ahmen Abdulazez Abdulkadir, *Roblox stock gains favor as analyst points to future ad growth and developer changes*, Investing.com (Oct. 28, 2024), https://in.investing.com/news/company-news/roblox-stock-gains-favor-as-analyst-points-to-future-ad-growth-and-developer-changes-93CH-4492474.

[32]    Shannon Lio, *How Roblox became the 'it' game for tweens – and a massive business* (Oct. 29, 2020), https://www.cnn.com/2020/10/27/tech/roblox-explainer/index.html.

[33]    *Roblox Emerges as a Top Online Entertainment Platform for Kids and Teens in 2017* (Mar. 21, 2018), https://ir.roblox.com/news/news-details/2018/Roblox-Emerges-as-a-Top-Online-Entertainment-Platform-for-Kids-and-Teens-in-2017/default.aspx.

[34]    Ari Levy, *While parents Zoom, their kids are flocking to an app called Roblox to hang out and play 3D games*, CNBC (Apr. 8, 2020), https://www.cnbc.com/2020/04/08/roblox-is-seeing-a-surge-during-coronavirus-shelter-in-place.html.

1  has encouraged schools and other organizations to use Roblox as a tool to teach kids coding,

2  highlighting "Roblox Educators" on their website.[35]

3      42.    According to a report from the National Center on Sexual Exploitation ("NCOSE"),

4  many of the games on Roblox contain sexually explicit themes, including strip clubs and dance

5  clubs.  U-13 users have access to much of this adult content.[36]  Youth have reported being lured into

6  virtual sexual experiences, including so-called "condo experiences," which involve visiting

7  someone's "home," and then being invited into the "bedroom" for virtual sexual acts.  The NCOSE

8  also reported children playing a so-called "rape game."[37]

9      43.    In some groups, members openly solicit sexual favors and the trading of child

10  pornography, often offering Robux in exchange for explicit photos.[38]  Users can also create porn

11  videos in Roblox Studio, giving rise to a new genre of "animated" porn.  Underage users, including

12  those under 9, may encounter sexually explicit images, hate speech, or violent content in all-ages

13  experiences.  For example, one game is titled "Beat Up Homeless Outside 7/11 Simulator" and is

14  available for users that self-identify as 13-plus.

15      44.    According to a research report by Hindenburg Research, one former employee said

16  that employees face pressure to not implement safety features that might cause users to leave the

17  platform or otherwise reduce engagement.[39]

18      45.    Roblox has failed to keep children safe on its platform.  Although the company is

19  aware that the platform allows adult predators to reach children, Roblox does not verify the age and

20

---

21  [35]  *See* Roblox, *A new era of engaged learning*, https://education.roblox.com/educators/
22  tps://create.roblox.com/docs/education/resources/roblox-educators (last visited Dec. 18, 2024).

23  [36]  *Roblox: Inflated Key Metrics For Wall Street And A Pedophile Hellscape For Kids*, Hindenburg
     Research (Oct. 8, 2024), https://hindenburgresearch.com/roblox/.

24  [37]  Letter from Patrick Truman & Dawn Hawkins, Nat'l Ctr. of Sexual Exploitation, to David
25  Baszucki, Founder & CEO, Roblox (May 1, 2023), https://endsexualexploitation.org/wp-
     content/uploads/Roblox-Notification-Letter_DDL-2023_FINAL.pdf.

26  [38]  *Roblox: Inflated Key Metrics For Wall Street And A Pedophile Hellscape For Kids*, *supra* note
27  34.

28  [39]  *Id.*

1    identity of its users.  Neither does it require parental approval for underage users of its platform.  It

2    takes less than one minute to create an account.

3         46.    Roblox rejected features that current and former employees recommended.[40]  For

4    example, the company rejected pop-up safety notices and defaulting safety settings to disallow users

5    from talking to strangers.  According to some employees, the company is too reliant on artificial

6    intelligence ("AI") to moderate chats even though the technology is not capable of detecting subtle

7    signs of grooming.[41]  The company, including top management, also rejected a proposal by its

8    employees that would have required u-13 users to sign up with a parent's approval and provide a

9    parent's email address.[42]

10        47.    Child sexual abuse is rampant on Roblox.  In 2023, Roblox reported over 13,000

11   incidents to the National Center for Missing and Exploited Children, according to the Bloomberg

12   report.[43]  Since 2018, police in the US have arrested around 24 predators for grooming and abusing

13   victims on Roblox.[44]  For example, in 2023, a California man was arrested after traveling across the

14   country to sexually abuse a 14-year-old he met and groomed on Roblox.  Another 14-year-old girl in

15   Ohio was sexually assaulted by a man she met on Roblox.  The man posed as a 17-year-old on the

16   platform and convinced the girl to send him nude images before picking her up from school and

17   sexually assaulting her.  More recently, a California man pleaded guilty to child pornography

18   charges for victimizing a 12-year-old girl he met on Roblox after posing as a 13-year-old boy and

19   convincing her to send him sexually explicit images of herself and a 5-year-old relative.[45]  One 48-

20

21   _____

     [40]  Carville & D'Anastasio, *Roblox's Pedophile Problem*, *supra* note 26.

22   [41]  *Id.*

23   [42]  *Roblox: Inflated Key Metrics For Wall Street And A Pedophile Hellscape For Kids*, *supra* note
     34.
24

25   [43]  Carville & D'Anastasio, *Roblox's Pedophile Problem*, *supra* note 26.

26   [44]  *Id.*

27   [45]  Vivian Chow, *Southern California man catfished young girl, convinced her to send sexual
     images*, KTLA News (Jan. 31, 2025), https://ktla.com/news/local-news/southern-california-man-
     convicted-of-catfishing-young-girl-convincing-her-to-send-images/.
28

1  year-old registered sex offender in Kansas lured an 8-year-old girl into giving him 20 explicit images

2  and videos she had shot of herself using her iPad with the promise of exchanging Robux.[46]

3      48.    Roblox's recent attempts to make the platform safer have failed.  According to an

4  investigation by Revealing Reality reported in *The Guardian*, children as young as five are still able

5  to communicate with adults while playing games on the platform.[47]  The report also found examples

6  of adults and children interacting with no effective age verification.  This was despite Roblox

7  purportedly changing its settings in November 2024 so that u-13 accounts can no longer direct

8  message others outside of games and requiring parental consent to use direct messaging within

9  experiences.

10      49.    Additionally, Roblox illegally harvests information from u-13 users in violation of

11  COPPA.  For 13-plus users, Roblox's privacy policy allows for the collection and disclosure of

12  personal information to third parties for advertising purposes, including contact identifiers, user

13  characteristics and demographics, and device identifiers.[48]  If enabled by the user, Roblox also shares

14  geolocation data that Roblox uses to personalize content and advertising.[49]  Roblox also uses a slew

15  of tracking services including Google Analytics.[50]

16      50.    Roblox purports to have a  distinct privacy policy for u-13 users from whom it only

17  collects non-personal information in compliance with COPPA.  But even facially, Roblox's u-13

18  privacy policy collects impermissible data.  For example, Roblox collects information about the

19  games underage users play to give those users similar recommendations.[51]

20

21  _____

    46  Carville & D'Anastasio, *Roblox's Pedophile Problem*, *supra* note 26.

22  47  Libby Brooks and Jedidaiah Otte, *Risks to children playing Roblox 'deeply disturbing', say*
23  *researchers*, The Guardian (April 14, 2025), https://www.theguardian.com/technology/2025/apr/14/
    risks-children-roblox-deeply-disturbing-researchers.

24  48  *Id.*

25  49  *Id.*

26  50  *Id.*

27  51  Roblox Privacy and Cookie Policy, Effective June 4, 2025, https://en.help.roblox.com/hc/en-
28  us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy.

51.     At no point does Roblox obtain "verifiable parental consent" as COPPA requires before collecting personal data about children.  Roblox's privacy policy includes only empty gestures toward COPPA compliance by providing u-13 users the option to provide their parents' email address at sign up and suggesting that children under 13 obtain parental permission prior to use.[52]

52.     Moreover, Roblox knows or should know that u-13 users can and do register as 13-plus because Roblox has no effective age verification.  Accordingly, when the platform collects data on users that report their age as over 13, Roblox knows that it is also collecting data on children u-13 in violation of COPPA.  Thus, Roblox knowingly collects data from children under 13 because it turns a blind eye to underage users who register on the platform as 13-plus.

**E.      Defendants Employ Artificial Intelligence in Ways that Expose Youth to Harmful Experiences**

53.     Defendants utilize AI and machine learning through the development and operation of features, including the release of original content, that are inherently dangerous and harmful to youth.  These features serve to facilitate compulsive use, overuse, and addiction by youth users, as well as expose youth to harmful experiences due to the lack of meaningful protections for youth users.

54.     Defendants' use of AI and machine learning falls into at least three categories: the use of AI to promote addictive use; AI machine learning to conduct content moderation; and the development and publication of AI-generated original content, including, but not limited to, through large language models such as chatbots.

55.     Defendants, including Google, YouTube, Meta, Facebook, Snap, Discord, and TikTok, intentionally design and operate their platforms to maximize users' screen time through the use of features intended to exploit human psychology using complex algorithms driven by advanced AI and machine-learning systems.  For example, YouTube has developed and operates machine learning technology with the goal of increasing the amount of time users spend watching content on YouTube.  The AI-driven suggestions succeed in maximizing user engagement.  YouTube Chief

---

[52]   *Id.*

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL - MDL Case No. 4:22-md-03047-YGR
4899-9761-9477.v1

- 14 -

1   Product Officer Neal Mohan stated in 2018 that YouTube's AI-driven recommendations are

2   responsible for 70% of the time users spend on YouTube.[53]  In other words, 70% of all YouTube

3   content that users watch was recommended to users by YouTube's machine learning technology, as

4   opposed to users purposely searching for and identifying the content they watch.  Defendants have

5   failed to implement effective parental controls to prevent such activity from causing harm to youth.

6   Defendants have failed to implement effective tools for youth/parent users to choose to avoid such

7   problematic and harmful experiences.

8        56.    Meta also uses AI to keep users engaged.    Rather than display information

9   chronologically, posts are displayed based on a user's previous online activity, including whether the

10  user previously "share[d]," "like[d]," or otherwise engaged with similar content.[54]  In March 2024,

11  Meta unveiled that it will begin using a new artificial model across all its Social Media Platforms

12  that promises to be even more effective at prolonging the time that users spend online.[55]  Tom

13  Alison, head of Facebook, said that the new model kept users watching its video "Reels" for 8%-

14  10% longer, proving that the model was "learning from the data much more efficiently than the

15  previous generation."  Defendants have failed to implement effective parental controls to prevent

16  such activity from causing harm to youth.  Defendants have failed to implement effective tools for

17  youth/parent users to choose to avoid such problematic and harmful experiences.

18       57.    Second, Defendants rely on AI-driven technology to moderate content on their

19  platforms, which fail to detect and block inappropriate and harmful content accessed by youth.  This

20  leads to harms, including, but not limited to, youth users getting exposed to CSAM; getting targeted

21  by adult predators; and finding content that promotes self-harm, such as how to engage in cutting

22  and hide it from adults.  Defendants have failed to implement effective parental controls to prevent

23  ---

[53]   Joan E. Solsman, *YouTube's AI is the puppet master over most of what you watch*, CNET
24  (Jan. 20, 2018), https://www.cnet.com/tech/services-and-software/youtube-ces-2018-neal-mohan/.

25  [54]   Email from Nick Clegg to Mark Zuckerberg, Re: Well-being product strategy and tech
    headcount, (Aug. 28, 2021), https://www.blumenthal.senate.gov/imo/media/doc/13124meta
26  documents.pdf.

27  [55]   Jonathan Vanian, *Meta is building a giant AI model to power its 'entire video ecosystem,' exec
    says*, CNBC (Mar. 6, 2024), https://www.cnbc.com/2024/03/06/facebook-working-on-single-ai-
28  model-to-power-all-video-recommendations.html.

1    such activity from causing harm to youth.  Defendants have failed to implement effective tools for

2    youth/parent users to choose to avoid such problematic and harmful experiences.

3        58.    Third, Defendants have developed and are operating chatbots that engage with users,

4    including youth users, with original content composed by the applications themselves.  For instance,

5    Meta recently unveiled an AI chatbot with 28 personas, among them the "ride-or-die older sister"

6    resembling Kendall Jenner, aimed at engaging younger users.[56]  In 2023, Snap added to its feed "My

7    AI," an AI chatbot that engages with users, including children, with on-demand text produced by the

8    application itself.  Snapchat developed this "virtual friend" to further increase engagement.  It has

9    features that make its chatbot more "friendly," such as the option to customize the chatbot's name,

10   design a custom bitmoji avatar for it, and include it in group chats with friends.[57]  It is not possible to

11   remove the chatbot from a user's feed unless that user pays to subscribe to Snap's premium

12   subscription service.

13       59.    In tests that have been recreated multiple times, Snap's My AI responds to self-

14   identified youth users with inappropriate and misleading content, including how to hide the smells of

15   alcohol and marijuana, how to "set the mood" for a minor having sex with a 30-year-old for the first

16   time, and allows essay writing for self-identified students when asked to do so for a school project.[58]

17   It even explains to teens how to hide the Snap application from parental monitoring.[59]  In user tests,

18   the My AI becomes more problematic the longer one chats with it.[60]

19

---

20   [56]  Eliza Anderson, *Perspective: The troubling premise of Meta's new AI*, Deseret News (Nov. 25,
     2023),        https://www.deseret.com/2023/11/25/23970137/meta-ai-billie-big-sister-artificial-
21   intelligence-tom-brady-kendall-jenner/.

22   [57]  Samantha Murphy Kelly, *Snapchat's new AI chatbot is already raising alarms among teens and
     parents*,  CNN  Bus.  (Apr. 27,  2023),  https://www.cnn.com/2023/04/27/tech/snapchat-my-ai-
23   concerns-wellness/index.html.

24   [58]  Geoffrey A. Fowler, *Snapchat tried to make a safe AI.  It chats with me about booze and sex*,
     Wash. Post (Mar. 14, 2023), https://www.washingtonpost.com/technology/2023/03/14/snapchat-
25   myai/;  *see also*  Common  Sense  Media,  AI  Initiative,  *My  AI*  (Oct. 19,  2023),
     https://www.commonsensemedia.org/ai-ratings/my-ai.
26

27   [59]  *Id.*

28   [60]  *Id.*

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR
JURY TRIAL - MDL Case No. 4:22-md-03047-YGR                                              - 16 -
4899-9761-9477.v1

60.     Snap's My AI is also problematic in providing mental health advice to youth users because it can reinforce confirmation bias, allowing users to continue to feel badly if they approach the chatbot in a negative mood.[61]  According to Alexandra Hamlet, a clinical psychologist in New York City: "If a teen is in a negative mood and does not have the awareness desire to feel better, they may seek out a conversation with a chatbot that they know will make them feel worse. . . .  Over time, having interactions like these can erode [] teens' sense of worth, despite their knowing that they are really talking to a bot."[62]

61.     Defendants' large language models, such as Snap's My AI, put youth users at an unreasonable risk of harm and expose youth users to harmful experiences and inappropriate and dangerous content created by Defendants themselves.  Defendants are aware that their AI language models are "experimental" and yet continue to expose youth to harm through the original content they produce.[63]  Defendants have failed to implement effective parental controls to prevent such activity from causing harm to youth.  Defendants have failed to implement effective tools for youth/parent users to choose to avoid such problematic and harmful experiences.

**F.     Social Media Has Harmed Sonoma County Youth**

62.     Youth in Sonoma County have suffered from increased rates of depression and anxiety since the proliferation of social media.[64]  According to a 2024 survey of 14,882 high-school students in Sonoma County: (a) 31% of students felt so sad or hopeless almost every day for two weeks or more that they stopped doing usual activities in the past year; (b) 10% of students seriously considered suicide in the past year; (c) 23% of students visited a school counselor, a therapist, or a

---

[61]    Sarah Perez, *Several popular AI products flagged as unsafe for Kids by Common Sense Media*, Tech Crunch (Nov. 16,  2023),  https://techcrunch.com/2023/11/16/several-popular-ai-products-flagged-as-unsafe-for-kids-by-common-sense-media/#:~:text=An%20independent%20review%20of%20popular%20AI%20tools%20has,Stable%20Diffusion%2C%20may%20not%20be%20safe%20for%20kids.

[62]    Samantha Murphy Kelly, *Snapchat's new AI chatbot is already raising alarms among teens and parents*, *supra* note 49.

[63]    Geoffrey A. Fowler, *Snapchat tried to make a safe AI.  It chats with me about booze and sex*, *supra* note 50.

[64]    Youth Truth Survey, *supra* note 1.

1    psychologist because they were upset, stressed, or had another problem in the past year; and (d) 13%

2    of students reported never or rarely feeling happy in the past 12 months.[65]

3         63.    In many cases, behavioral issues amongst youth in Sonoma County are directly

4    related to Defendants' social media platforms.  Indeed, a program manager for the Sonoma County

5    Youth and Family Services Department has seen myriad harms increase as a result of social media,

6    including the following: (a) increased bullying and harassment that is made more severe because

7    bullying can follow a victim home via social media; (b) increased exposure to adults who target

8    youth for the purpose of grooming and sexual exploitation; (c) increased exposure to unsafe and

9    inappropriate content impacting mental health; (d) increased exposure to incorrect information

10    impacting youth learning; (e) increased depression and anxiety, and, relatedly, self-esteem, body

11    image, and social comparison issues due to social media platforms and their mechanics; (f) increased

12    focus on creating an unrealistic persona in order to be liked or loved; (g) addiction to social media,

13    including negative impacts from use on in-person communication, disruption from sleep and

14    distraction from school; and (h) decrease in physical activity as youth spend more time on social

15    media than outdoors or engaging in other activities.  Sonoma County school counselors have also

16    noted an increase in requests for on-campus voluntary social-emotional services, on-site crises and

17    requests in navigating local resources, as compared to fewer requests for services in previous

18    years."[66]  Social media algorithms have exacerbated negative health consequences such as self-harm

19    among youth in Sonoma County.  The Sonoma County Behavioral Health Division has provided

20    services to youth who report that after posting on TikTok and other social media platforms about

21    self-harm, *e.g.*, cutting or suicide, the algorithm fed those youth more content encouraging such

22    behaviors.  Many youth crises response calls reveal that youth learn how to self-harm or end their

23    life through social applications like Snapchat and TikTok.  In fact, one youth reported having been

24    offered to purchase a gun via social media as a means to carry out his intent to commit suicide.

25

26    [65]  *Id.*

27    [66]  Katherine Minkiewicz-Martine, *Now more than ever, Sonoma County youth are struggling with mental health*, The Healdsburg Tribune (Apr. 26, 2022), https://www.healdsburgtribune.com/now-more-than-ever-sonoma-county-youth-are-struggling-with-mental-health/.

28

1    Other youth have expressed that social media has made their struggles with self-image more acute

2    because social media is a constant source of appearance comparison.

3        64.    The Sonoma County Behavioral Health Division has documented the negative

4    impacts of social media addiction among the clients it serves.  The Mobile Support Team, Sonoma

5    County's crisis response service, has responded to countless calls arising from youth who, as a result

6    of having social media taken away, threaten suicide or self-harm.  In one instance, a 16-year-old girl

7    physically attacked her mother, kicking and hitting because her mother had threatened to take away

8    her cell phone, along with social media access.  The Mobile Support Team developed a crisis safety

9    plan with the youth to help keep her family safe and move on from the incident.  Other youth clients

10   have had difficulty with communication in the "real world" because of social media addiction to

11   Discord and Roblox.  Others report having a hard time sleeping or are distracted from life activities

12   because they feel compelled to use their phone.  Some youth report being unable to maintain in-

13   person friendships for fear of losing control over how others perceive them because, unlike on social

14   media, they cannot filter their images or edit their words before posting.  There have also been

15   multiple cases of youth who pursue romantic relationships with AI "chat bots" on social media

16   platforms, including engaging with AI personas that may be abusive and exploitative.

17       65.    There have also been several incidents of violence related to social media use in

18   Sonoma County, including threats against schools and arrests of students.  In a 2021 incident, classes

19   were cancelled at West County High School and Laguna High School after a threat of violence was

20   posted on social media.[67]  In March 2023, a Sonoma Valley student was arrested on suspicion of

21   threatening violence against a list of targets including Altimira Middle School.[68]  And in September

22   2024, a 14-year-old posted a threat indicating that an act of violence would happened at Petaluma

23

24   _____

25   [67] *Social Media Threat Forces Classes To Be Canceled At Two Sonoma County Schools*, CBS
     News (Oct. 29, 2021), https://www.cbsnews.com/sanfrancisco/news/threat-forces-classes-to-be-
26   canceled-at-two-sonoma-county-schools/#:~:text=SEBASTOPOL%20(CBS%20SF)%20%2D%
     2D%20While%20not%20disclosing,said%20in%20a%20posting%20on%20their%20website.

27   [68]  Jeremy Hay, *Sonoma Valley student arrested on suspicion of making threats*, The Press
     Democrat (Mar. 18, 2023) https://www.pressdemocrat.com/article/news/sonoma-valley-student-
28   arrested-on-suspicion-of-making-threats/?utm_source=article_share&utm_medium=copy-link.

1  High School and Casa Grande High School.[69]  In still another incident, a student at Analy High

2  School threatened another student via social media saying "I'm going to blow your head off."  This

3  was reported by another student and responded to by Sonoma County's Behavioral Health Division.

4       66.    In addition to threats of violence, Sonoma County has been impacted by vandalism

5  encouraged by social media challenges.  For example, beginning in 2021, a challenge posted on

6  TikTok called "devious licks" encouraged students to post content to social media documenting

7  property damage at schools.  At several Sonoma County schools, students stole property, vandalized

8  bathrooms, and caused other damage, posting their actions on social media.  When the challenges

9  escalated to encouraging violence against teachers, including sexual assault, administrators spent

10  time and resources communicating with parents and otherwise trying to prevent greater harm to their

11  schools.[70]

12       67.    Youth in Sonoma County also report high levels of online bullying and harassment.

13  In January 2024, 11% of high-school survey respondents reported bullying or harassment that school

14  year.  Forty percent of those students reported their bullying occurred electronically.[71]  Students

15  reported telling an adult from school 26% of the time they were bullied or harassed.[72]  Anecdotes

16  from the Sonoma County Behavioral Health Division highlight the harm these youth face.  In one

17  instance, a teen girl's bullies turned a photo of the girl into a disparaging meme and circulated the

18  image via social media.  As a result, she experienced suicidal ideation.  In another instance, a 9-year-

19  old girl's peers created a "hate" page on YouTube dedicated to bullying her.  The crisis response

20  team was called to the girl's elementary school when she passed a note communicating her desire to

21

22  _____

23  [69]  Carlos Castaneda, *14-year-old arrested after Petaluma high schools threatened on social media*, *Carlos Castaneda*, CBS News (Sept. 12, 2024), https://www.cbsnews.com/sanfrancisco/news/petaluma-high-school-casa-grande-threat-arrest/.

24
25  [70]  Alaina Minkler & Kaylee Tornay, *'Smack a teacher': Sonoma County school officials worried about viral TikTok challenges*, The Press Democrat (Oct. 11, 2021), https://www.pressdemocrat.com/article/news/sonoma-county-school-officials-worried-about-devious-licks-viral-tiktok-c/.

26

27  [71]  Youth Truth Survey, *supra* note 1.

28  [72]  *Id.*

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR
JURY TRIAL - MDL Case No. 4:22-md-03047-YGR
4899-9761-9477.v1

- 20 -

1   end her life and listing the reasons she no longer wanted to live.  Previously, she had attempted

2   hanging herself using a jump rope.

3        61.    Other Sonoma County youth have also reported bullying through fake profile pages.

4   In one case, peers posted critical images, videos and comments on a fraudulent Instagram account

5   created with the youth's name.  Another teen girl reported that a fake account was made in her name,

6   to which lewd pictures were posted purporting to be the girl.  As a result, she experienced emotional

7   distress and anxiety, causing her to stay home from school for weeks.

8        68.    County officials reported that police departments, hospitals, and public and nonprofit

9   service providers in 2020 have seen an uptick in local teens and adolescents needing mental and

10   behavioral health services, a reality that has strained resources of some response programs.[73]  As a

11   result, Sonoma County has been forced to divert resources and expend additional resources in an

12   attempt to address the decline in youth mental, emotional, and social health within its schools.  In

13   fact, voters approved a sales tax to fund mental health programs, including for youth.

14        69.    Sonoma County still requires significantly greater and long-term funding to address

15   the nuisance Defendants have created.  It is time, as President Biden declared, to get "all Americans

16   the mental health services they need."[74]

17       **G.**    **Social Media Has Had a Harmful Effect on Sonoma County**

18        70.    Sonoma County is uniquely harmed by the current youth mental health crisis.  It

19   funds extensive mental health services for youth up to 18 years old, including case management

20   services, crisis intervention and stabilization, psychiatric evaluation, enhanced mental health services

21   for youth in residential care and therapy.  As part of its crisis intervention services, Sonoma County

22   funds a Mobile Support Team providing crisis response services.  Sonoma County also funds

23   extensive wrap-around services for youth and families with children age 5-12 years old, and a Crisis

24

---

[73]   Yousef Baig, *Rise in Mental health crisis among Sonoma County youth a growing concern*, The
Press Democrat (Nov. 29, 2020), https://www.pressdemocrat.com/article/news/rise-in-mental-health-
crises-among-sonoma-county-youth-a-growing-concern/.

[74]   Donald Judd, *Biden pledges 'mental health care is health care' with new rule ensuring mental
health parity in insurance coverage*, CNN Politics (July 25, 2023),
https://www.cnn.com/2023/07/25/politics/biden-mental-health-care-coverage/index.html.

1 | Assessment Prevention & Education Team aimed at pre early intervention services to youth age 16-
2 | 25 years old who are at risk of psychiatric illness.

3 |     71.    Sonoma County has invested in resources to address student mental health issues due
4 | to the youth mental crisis.  Despite all of the programs and services it offers and funds, Sonoma
5 | County is struggling to provide enough mental health services because of the increase in youth
6 | seeking these services.

7 |     72.    Sonoma County has borne increased costs and expenses in response to the youth
8 | mental health crisis.  These costs include allocating funding for, among other expenses:

9 |     (a)    developing additional mental health resources including mental health
10 | programs for Sonoma County youth;

11 |     (b)    hiring additional mental health personnel to focus on youth mental health;

12 |     (c)    training social workers and other personnel to help youth with their mental
13 | health, including assessment and diagnosis tools, suicide prevention approaches, trauma-informed
14 | care strategies, and certified peer support programs for young adults;

15 |     (d)    producing and distributing educational materials on social, emotional, and
16 | mental health for youth, including suicide prevention materials;

17 |     (e)    coordinating and delivering mental health care services within Sonoma
18 | County, including offering assessments, case management, therapy, and suicide prevention efforts;

19 |     (f)    increasing intervention services;

20 |     (g)    investigating and responding to threats made over social media;

21 |     (h)    the voters of Sonoma County approved a sales tax hike, called Measure O, to
22 | address the growing mental health crisis, contributed to in part by Defendants' platforms;

23 |     (i)    repairing property damaged as a result of the exploitative and harmful content
24 | Defendants directed at youth;

25 |     (j)    increasing disciplinary services and time spent addressing cyberbullying,
26 | harassment, school disruption, and threats;

27 |     (k)    investigating and responding to social media threats made by or against
28 | Sonoma County Youth; and

(l)      increasing resources to law enforcement and other diversionary services to address increase in anti-social and criminal behavior by youth.

**III.     ADDITIONAL CAUSES OF ACTION**

**COUNT III**

**Fraudulent Misrepresentation and Concealment**
**(Against All Defendants)**

73.     At all times relevant to this litigation, each Defendants concealed and intentionally failed to disclose material facts known to them regarding the dangers of their social media platforms for youth. Defendants sought to further the public perception about the safety of their social media platforms for youth by disseminating false statements to Congress and to the public. Any risk disclosures were substantially understated.

74.     Each Defendant intended the omission of the concealed facts to deceive Plaintiff, and intended Plaintiff to rely upon the omission.

75.     Plaintiff was unaware of the concealed facts. Plaintiff, its agents, and the public justifiably relied on the false information Defendants provided to them, both directly and indirectly, as Defendants intended.

76.     As a result, Plaintiff proceeded under the misapprehension that the youth mental health crisis was a result of conduct by persons other than Defendants and was prevented from taking more effective and earlier steps to respond to the youth mental health crisis.

77.     Had Plaintiff known the truth about the concealed facts, Plaintiff would have taken other steps to correct the false information and address earlier the youth mental health crisis it faced.

78.     Each Defendant's failure to disclose information about the true level of danger presented by Defendants' social media platforms to Plaintiff's residents deceived Plaintiff and was a substantial factor in causing harm to Plaintiff.

79.     Plaintiff was damaged due to its justified reliance on each of the Defendants' fraudulent misrepresentations and concealments, which were made with oppression, fraud, or malice.

**COUNT IV**

**Gross Negligence**
**(Against All Defendants)**

80.     Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains harm proximately caused by the defendant's breach.  A presumption of negligence (negligence *per se*) is established where a defendant's negligence involves the violation of a statute or regulation, where the plaintiff is within the class of persons that the statute or regulation was designed to protect, and the violation is a substantial factor in the plaintiff's harm.

81.     Gross negligence is the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others, or where a defendant breaches a duty of care in a way that is unreasonably dangerous to consumers.

82.     Defendants owed the public legal duties, including a preexisting duty not to expose Plaintiff to an unreasonable risk of harm and a duty to exercise reasonable and ordinary care and skill in accordance with the applicable standards of conduct in designing, creating, operating, and marketing a product to youth.

83.     At all relevant times to this litigation, each of the Defendants owed Plaintiff duties under statutory and common law, including the duty to exercise reasonable care in the designing, marketing, promoting, and operating of their platforms and the duty to take all reasonable steps necessary to design, market, promote, and operate their platforms in a way that was not unreasonably dangerous to youth.

84.     At all times relevant to this litigation, Defendants knew or should have known of the dangers of Defendants' platforms and, specifically, that their prioritization and creation of harmful content and facilitation of widespread, excessive, and habitual use of their platforms by youth resulted in, and continues to result in, significant harm to Plaintiff.  As such, Defendants have breached their duty of care owed to Plaintiff.

85.     Defendants also owed Plaintiff the duty to comply with COPPA's prohibition on collecting personal information from users under 13 years old.  Defendants breached their duty under

1  COPPA by creating a platform targeted at users under 13, allowing users to self-report their age, and

2  collecting such data without any verifiable consent from the parents of its under-13 users.

3      86.     Defendants have breached and continue to breach their duty of care owed to Plaintiff

4  through their actions, business decisions, and policies in the development, setup, management,

5  maintenance, operation, marketing, advertising, promotion, supervision, and control of their

6  respective platforms.

7      87.     Defendants' gross negligence includes:

8          (a)     designing its social media platforms to be addictive;

9          (b)     targeting and aggressively marketing to youth to grow their platforms and

10  maximize ad revenue;

11          (c)     failing to implement effective parental controls;

12          (d)     failing to provide adequate options to parents and youth users to self-restrict

13  time spent on the platforms;

14          (e)     promoting cosmetic surgery filters to youth and failing to label filtered

15  content;

16          (f)     failing to implement robust age verification;

17          (g)     failing to implement reporting protocols to allow parents and youth users to

18  report CSAM, adult predator and other harmful content on the platform;

19          (h)     failure to warn of known risks of harm to youth; and

20          (i)     otherwise designing and marketing their social media platforms in ways that

21  cause significant harm to the mental health of Sonoma County's youth.

22      88.     Defendants knew and/or should have known it was foreseeable that Plaintiff would

23  suffer injuries as a result of Defendants' failure to exercise ordinary care in the designing, marketing,

24  promoting, and/or operating of their platforms, particularly when Defendants targeted youth in

25  Sonoma County.

26      89.     Defendants' gross negligence was an extreme departure from the ordinary standard of

27  conduct.  Defendants' conduct was so reckless, wanton, and lacking in care that it constitutes a

28  conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct,

1    including youth in Sonoma County, in that Defendants acted with reckless indifference to the results,

2    or to the rights or safety of others, because Defendants knew, or a reasonable person or company in

3    Defendants' position should have known, that Defendants' conduct created an unreasonable risk of

4    harm, and the risk was so great that it was highly probable harm would result.

5        90.    As a direct and proximate cause of Defendants' unreasonable and negligent conduct,

6    Plaintiff has suffered and will continue to suffer harm.

7        91.    Plaintiff is within the protected class of persons that COPPA was designed to protect

8    and Defendants' violation of COPPA is a substantial factor in Plaintiff's harm.

9                                    **COUNT V**

10                    **Violation of the Racketeer Influenced and**
                       **Corrupt Organizations Act,**
11                     **18 U.S.C. §1961, *et seq.***
                       **(Against All Defendants)**
12

13       92.    This claim is brought by Plaintiff against all Defendants for actual damages, treble

14   damages, and equitable relief under 18 U.S.C. §1964 for violations of the Racketeer Influenced and

15   Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq.*

16       93.    RICO makes it "unlawful for any person employed by or associated with any

17   enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

18   participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

19   racketeering activity."  18 U.S.C. §1962(c).

20       94.    At all relevant times, each Defendant is and has been a "person" within the meaning

21   of 18 U.S.C. §1961(3) because each is capable of holding, and does hold, "a legal or beneficial

22   interest in property."

23       95.    Each Defendant conducted the affairs of an enterprise through a pattern of

24   racketeering activity, in violation of 18 U.S.C. §1962(c), as described herein.

25       96.    Plaintiff is a "person" within the meaning of 18 U.S.C. §1961(3) and has standing to

26   sue under 18 U.S.C. §1964(c) because it was and is injured in its business and/or property "by reason

27   of" the RICO violations described herein.

28

97.    Defendants – through the use of Front Groups that appeared to be independent of Defendants and through the dissemination of publications that supported Defendants' scheme – conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of fraud by way of corruption of an official proceeding, and mail and wire fraud), to carry out the common purpose of the Enterprise, *i.e.*, to promote false and misleading statements to Congress and the American public about the safety of their platforms for youth users while simultaneously flooding youth with harmful experiences designed to be addictive, thereby maximizing profits and revenues.  Through the racketeering activities of the Enterprise, Defendants sought to further the public perception about the safety of their social media platforms for youth by disseminating false statements.  In so doing, each of the Defendants knowingly conducted and participated in the conduct of the Enterprise by obstructing justice by providing false and misleading testimony to Congress regarding social media platforms in violation of 18 U.S.C. §1512(c) and by engaging in mail and wire fraud in violation of 18 U.S.C. §1962(c)-(d).

98.    Plaintiff demands all applicable relief.

99.    **The Enterprise**.  Section 1961(4) of the U.S. Code defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §1961(4).

100.    The Enterprise alleged above is an association-in-fact enterprise that consists of Defendants and their Front Groups (Net Choice, CCIA, ITI, Tech Net, and Chamber of Progress).

101.    Defendants formed an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. §1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.  The members of the Enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  There may also be other members of the enterprise unknown to Plaintiff at this time.

102.    Each of the Defendants exerted control over the Enterprise and participated in the conduct of the Enterprise by playing a distinct role in furthering the Enterprise's common purpose of

1 increasing profits through the knowing and intentional dissemination of false and misleading

2 information about the safety of Defendants' social media platforms for youth.

3     103. The scheme was profitable as evidenced by a 2023 study led by the Harvard T.H.

4 Chan School of Public Health estimating that Defendants' made nearly $11 billion in advertising

5 revenue from users under the age of 18 in 2022.

6     104. Specifically, Defendants each worked together to coordinate the Enterprise's goals

7 and conceal their role, and the Enterprise's existence, from the public by, among other things:

8 (a) preserving and enhancing the market for their social media platforms and Defendants' own

9 profits, regardless of the truth, the law, or the health consequences to America's youth, including

10 Plaintiff's students; (b) deceiving consumers, especially children, adolescents, teenagers, and their

11 parents, into using their platforms by falsely maintaining that their platforms are safe for youth;

12 deceiving consumers, especially children, adolescents, and teenagers and their parents, into using

13 their platforms by falsely maintaining that their platforms are safe for youth users and not

14 responsible for the apparent mental or emotional health consequences to children, adolescents, and

15 teenagers, despite that Defendants knew otherwise; (c) deceiving consumers, especially children,

16 adolescents, teenagers, and their parents, into using their platforms by falsely maintaining that

17 Defendants could mitigate the mental or emotional health consequences to children, adolescents, and

18 teenagers, despite Defendants knowing these negative consequences were inherent to their

19 platforms' features and technology; (d) deceiving consumers, especially children, adolescents, and

20 teenagers, into becoming or staying addicted to their platforms by maintaining that their platforms

21 were not addictive or that any addictive consequences could be mitigated, despite the fact that

22 Defendants knew their platforms were inherently addictive by design; (e) deceiving consumers,

23 particularly parents, children, adolescents, and teenagers, by claiming they did not market to

24 children, adolescents, and teenagers, while engaging in marketing and manipulation of their platform

25 algorithms with the intent of causing children, adolescents, and teenagers to engage in excessive use

26 of their platforms, regardless of the health or safety concerns; and (f) deceiving consumers about the

27 mental and emotional health risks to children, adolescents, and teenagers associated with

28 Defendants' platforms, including that their platforms were intentionally and deliberately designed to

1    target children, adolescents, and teenagers and encouraging excessive and harmful behavior; that

2    Defendants had the ability to manipulate and did manipulate their platforms to be highly addictive;

3    and that Defendants targeted children, adolescents, and teenagers specifically to maximize their

4    engagement despite knowledge of resultant harm to youth users.

5          105.    Each of the Front Groups helped disguise the role of Defendants by purporting to be

6    unbiased, independent professional organizations in order to disseminate a body of messaging that

7    promoted Defendants' false messages.

8          106.    The Enterprise has pursued a course of conduct of deceit, misrepresentation, and

9    conspiracy to make misrepresentations to the public; to withhold from the public facts material to the

10   decision to use or permit children, adolescents, and teenagers to use Defendants' platforms; and to

11   promote and maintain sales from Defendants' platforms, and the profits derived therefrom, as well as

12   to shield themselves from public, judicial, and governmental scrutiny.

13         107.    At all relevant times, the Enterprise: (a) had an existence separate and distinct from

14   each Defendant and its members; (b) was separate and distinct from the pattern of racketeering in

15   which Defendants engaged; (c) was an ongoing and continuing organization consisting of

16   individuals, persons, and legal entities, including each of the Defendants; (d) was characterized by

17   regular communication and interpersonal relationships between and among each member of the

18   Enterprise, including between Defendants and each of the Front Groups; and (e) had sufficient

19   longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

20         108.    The persons and entities engaged in the Enterprise are systematically linked through

21   contractual relationships, financial ties, personal relationships, and continuing coordination of

22   activities, as spearheaded by Defendants.

23         109.    Defendants alone could not have accomplished the purpose of the Enterprise without

24   the assistance of the Front Groups, which were perceived as "neutral" as compared to Defendants

25   themselves.  Without the work of the Front Groups in spreading misrepresentations about the safety

26   of youth social media use, the Enterprise could not have achieved its common purpose.  As a result,

27   it is clear that Defendants and the Front Groups were each a willing participant in the Enterprise, had

28

1    a common purpose and interest in the object of the scheme, and functioned within a structure

2    designed to effectuate the Enterprise's purpose.

3    110.    **Pattern of Racketeering Activity**.  Defendants, each of whom is a person associated

4    with, or employed by, the enterprise, did knowingly, willfully, and unlawfully conduct or participate,

5    directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within

6    the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c).  The racketeering activity was made

7    possible by each Defendant's regular and repeated use of the facilities and services of the Enterprise.

8    Each Defendant had the specific intent to engage in the substantive RICO violations alleged herein.

9    111.    Further, each of the Defendants and Front Groups that made up the Enterprise had

10    systematic links to and personal relationships with one another through joint participation in

11    lobbying groups, trade industry organizations, contractual relationships, and continuing coordination

12    of activities.  The systematic links and personal relationships that were formed and developed

13    allowed members of the Enterprise the opportunity to form the common purpose and agree to

14    conduct and participate in the conduct of the Enterprise.  Specifically, each of the Defendants

15    coordinated its efforts through the same Front Groups, based on their agreement and understanding

16    that the Front Groups were industry friendly and would work together with Defendants to advance

17    the common purpose of the Enterprise; each of the individuals and entities that formed the Enterprise

18    acted to enable the common purpose and fraudulent scheme of the Enterprise.

19    112.    Defendants controlled the resources and instrumentalities of the Enterprise and used

20    that control to perpetrate numerous misleading schemes, including committing fraud through

21    corruption of an official proceeding by falsely testifying before Congress and through the use of mail

22    and wires.  Foremost, separate and apart from their regular business dealings, Defendants misled and

23    continue to mislead the public on the mental health dangers for youth on their platforms.

24    113.    Defendants had the common purpose of preserving and enhancing the market for their

25    platforms and for youth as consumers for Defendants' own profits, regardless of the truth, the law, or

26    the health consequences to the American people, including Plaintiff's students and the communities

27    Plaintiff serves.

28

114.    Defendants deceived consumers to use Defendants' platforms while concealing and/or suppressing the relevant findings and research.  Defendants deceived consumers, particularly parents, children, adolescents, and teenagers, by claiming they did not market to children, adolescents, and teenagers while engaging in marketing and manipulation of their platform algorithms with the intent of causing children, adolescents, and teenagers to engage in excessive use of their platforms, regardless of the health or safety concerns.

115.    Defendants achieved their common purpose through coconspirators' actions in deceiving consumers, regulators, and the general public about the dangerous nature of their platforms.  Through the Enterprise, Defendants engaged in a pattern of racketeering activity consisting of numerous acts of racketeering in the Northern District of California and elsewhere, including corruption of an official proceeding, mail fraud, and wire fraud, indictable offenses under 18 U.S.C. §§1512(c), 1341, and 1343.

116.    **Predicate Acts**.  Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1512(c), 1341, and 1343) within the past ten years.  The multiple acts of racketeering activity that Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Enterprise, testimony before Congress, and the U.S. mail and interstate wire facilities.  Defendants participated in the scheme to defraud by obstructing justice and by using mail, telephones, television, and the Internet to transmit false and misleading messaging in interstate or foreign commerce.

117.    From a time unknown and continuing until the time of filing of this Complaint, in the Northern District of California and elsewhere, Defendants and others known and unknown did knowingly and intentionally devise and intend to devise a scheme and artifice to mislead, and obtain money and property from, members of the public by means of material false and misleading pretenses, representations, and promises, and omissions of material facts, knowing that the pretenses, representations, and promises were false when made.

118.    Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a)    **Corruption of an Official Proceeding**: Defendants violated 18 U.S.C. §1512(c) by providing false and misleading testimony to Congress and concealing and/or obstructing, influencing, and/or impeding official proceedings related to the benefits and safety of youth social media use;

(b)    **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, messages via the U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to target and addict youth to social media by means of false pretenses, misrepresentations, promises, and omissions in order to increase profits; and

(c)    **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, messages by wire for the purpose of executing the unlawful scheme to target and addict youth to social media by means of false pretenses, misrepresentations, promises, and omissions in order to increase profits.

119.    It was part of said scheme and artifice that Defendants would represent that their platforms pose no substantial risk of mental or emotional health concern to children, adolescents, and teenagers and were not addictive when, in fact, their platforms did pose such risks and that their platforms were intentionally and deliberately designed to target children, adolescents, and teenagers and encourage excessive and harmful behavior.

120.    It was further part of said scheme and artifice that Defendants and their coconspirators, through the Enterprise, would and did maintain sales and profits of their platforms by concealing and suppressing material information regarding the mental and emotional health risks to children, adolescents, and teenagers associated with their usage, including that their platforms were intentionally and deliberately designed to target children, adolescents, and teenagers and to encourage excessive and harmful behavior; that they had the ability to manipulate and did manipulate their platforms to be highly addictive; and that Defendants targeted children, adolescents, and teenagers specifically.

121.    It was further part of said scheme and artifice that, in order to conceal the health risks of their platforms, Defendants and their coconspirators, through the Enterprise, would and did make false representations and misleading statements to the public; would and did falsely represent that Defendants would fund and conduct objective, scientific research and disclose the results of such research to resolve concerns about mental and emotional health related issues to youth; would and did falsely represent that Defendants did not target children, adolescents, and teenagers; would and did suppress and hide adverse research results; would and did misrepresent and fail to disclose their ability to manipulate, and the manipulation of, their platforms and their platforms' addictive qualities; and would and did misrepresent their actions to government personnel and others.

122.    It was a further part of said scheme and artifice that Defendants and their coconspirators, through the Enterprise, would and did misrepresent, conceal, and hide and cause to be misrepresented, concealed, and hidden the purpose of, and acts done in furtherance of, the scheme.

123.    It was a further part of said scheme and artifice, and in furtherance thereof, that Defendants would and did communicate with each other and with their coconspirators and others, in person, by mail, and by telephone and other interstate and foreign wire facilities, regarding the true nature of their platforms and the mental and emotional health risks to children, adolescents, and teenagers.

124.    It was further part of said scheme and artifice that Defendants made communications directed toward government officials and to the public in furtherance of their conspiracy to deceive the public by means of telephone, mail, internet, television, wire transmissions, and other forms of interstate commerce and communications, in violation of 18 U.S.C. §1512(c).

125.    For purposes of executing and attempting to execute that scheme and artifice, Defendants and their coconspirators, through the Enterprise, would and did knowingly transmit and cause to be transmitted in interstate and foreign commerce by means of wire, radio, and television communication writings, signs, signals, pictures, and sounds (collectively "transmissions") in violation of 18 U.S.C. §§1341 and 1343.

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL - MDL Case No. 4:22-md-03047-YGR
4899-9761-9477.v1

- 33 -

126.   Because Defendants disguised their participation in the Enterprise and worked to keep even the Enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Enterprise's uses of the U.S. mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by Defendants and Front Groups.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.  However, Defendants and Front Groups disseminated misrepresentations and false statements to Sonoma County and to consumers and regulators in Sonoma County.

127.   For the purpose of executing and attempting to execute the scheme and artifice described herein, Defendants and their coconspirators, through the Enterprise, would and did: (a) knowingly provide misleading and false testimony before Congress regarding the safety and targeting of social media platforms to youth, in violation of 18 U.S.C. §1512(c); (b) knowingly transmit those messages by wire, radio, or television; (c) knowingly place and cause to be placed in any post office or authorized depository for mail matter, matters and things to be sent and delivered by the U.S. Postal Service (and its predecessor, the United States Post Office Department) such false and/or misleading messages; (d) knowingly take and receive therefrom such matters and things; and knowingly cause to be delivered by mail according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such messages, in violation of 18 U.S.C. §§1341 and 1343.

128.   The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

129.   The racketeering activities conducted by Defendants and Front Groups amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiff.  Each separate instance of corruption of an official proceeding, and use of the U.S. mail and/or interstate wire facilities employed by Defendants, was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims,

1    including Plaintiff.  Defendants have engaged in the pattern of racketeering activity for the purpose

2    of conducting the ongoing business affairs of the Enterprise.

3        130.    Each of the Defendants aided and abetted others in the violations of the above laws,

4    thereby rendering them indictable as principals in the 18 U.S.C. §§1512(c), 1341, and 1343 offenses.

5        131.    Defendants' violations of law and their pattern of racketeering activity directly and

6    proximately caused Plaintiff injury in its business and property.  Defendants' pattern of racketeering

7    activity logically, substantially, and foreseeably caused a youth social media addiction epidemic.

8    But for the youth social media addiction epidemic Defendants created through their Enterprise,

9    Plaintiff would not have lost money or property.  Plaintiff's injuries, as described below, were not

10   unexpected, unforeseen, or independent.  Such costs were either completely new or greatly in excess

11   of the norm of what Plaintiff would ordinarily pay or be expected to pay to provide services to its

12   students and communities.

13       132.    It was foreseeable and expected that Defendants' creation and then participation in

14   the Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would

15   lead to a youth social media addiction epidemic, including in Sonoma County.

16       133.    Plaintiff has suffered injury in fact and has lost money or property as a direct and

17   proximate result of Defendants' violations of RICO, including, but not limited to, additional time,

18   costs, and expenses that Plaintiff has incurred, and will continue for the foreseeable future to incur,

19   for, *inter alia*, the following:

20           (a)    developing additional mental health resources including mental health

21   programs for Sonoma County youth;

22           (b)    hiring additional mental health personnel to focus on youth mental health;

23           (c)    training social workers and other personnel to help youth with their mental

24   health, including assessment and diagnosis tools, suicide prevention approaches, trauma-informed

25   care strategies, and certified peer support programs for young adults;

26           (d)    producing and distributing educational materials on social, emotional, and

27   mental health for youth, including suicide prevention materials;

28

1    (e)    coordinating and delivering mental health care services within Sonoma

2  County, including offering assessments, case management, therapy, and suicide prevention efforts;

3    (f)    increasing intervention services;

4    (g)    investigating and responding to threats made over social media;

5    (h)    the voters of Sonoma County approved a sales tax hike, called Measure O, to

6  address the growing mental health crisis, contributed to in part by Defendants' platforms;

7    (i)    repairing property damaged as a result of the exploitative and harmful content

8  Defendants directed at youth;

9    (j)    increasing disciplinary services and time spent addressing cyberbullying,

10  harassment, school disruption, and threats;

11    (k)    investigating and responding to social media threats made by or against

12  Sonoma County Youth; and

13    (l)    increasing resources to law enforcement and other diversionary services to

14  address increase in anti-social and criminal behavior by youth.

15    134.    Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*,

16  actual damages; treble damages; equitable and/or injunctive relief in the form of Court-supervised

17  corrective communications, actions and programs; forfeiture as deemed proper by the Court;

18  attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest.

19  **PRAYER FOR RELIEF**

20    WHEREFORE, Plaintiff prays for judgment as follows:

21    1.    Entering an order that the conduct alleged herein constitutes negligence, gross

22  negligence, and a public nuisance under California law and violates the Federal RICO Act;

23    2.    Entering an order that Defendants are jointly and severally liable;

24    3.    Entering an order requiring Defendants to abate the public nuisance described herein

25  and to deter and/or prevent the resumption of such nuisance;

26    4.    Enjoining Defendants and any agents, successors, assigns, and employees acting

27  directly or through any corporate or business device from engaging in further actions causing or

28

contributing to the public nuisance as described herein and requiring Defendants to take affirmative steps to ensure their platforms are safe for youth users;

5.  Enjoining Defendants from further violations of COPPA and directing that Defendants take affirmative steps to obtain "verifiable parental consent" prior to collecting and using information about them;

6.  Directing Defendants to disgorge and forfeit all profits they have derived as a result of their fraudulent and deceptive acts and practices as set forth in this Complaint;

7.  Awarding equitable relief to fund prevention education and treatment for excessive and problematic use of social media;

8.  Awarding actual and compensatory damages;

9.  Awarding statutory damages in the maximum amount permitted by law;

10.  Awarding reasonable attorneys' fees and costs of suit;

11.  Awarding pre-judgment and post-judgment interest; and

12.  Such other and further relief as the Court deems just and proper under the circumstances.

DATED:  July 9, 2025

                                 ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                 AELISH M. BAIG
                                 TAEVA C. SHEFLER


                                              s/ Aelish M. Baig
                                 AELISH M. BAIG

                                 One Montgomery Street, Suite 1800
                                 San Francisco, CA  94104
                                 Telephone:  415/288-4545
                                 415/288-4534 (fax)
                                 aelishb@rgrdlaw.com
                                 tshefler@rgrdlaw.com

OFFICE OF SONOMA COUNTY COUNSEL
ROBERT PITTMAN (172154)
County Counsel
JOSHUA MYERS (250988)
Chief Deputy County Counsel
575 Administrative Drive, Room 105A
Santa Rosa, CA  95403
Telephone:  707/565-2421
707/565-2624 (fax)
robert.pittman@sonoma-county.org
joshua.myers@sonoma-county.org

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK J. DEARMAN
STUART A. DAVIDSON (admitted *pro hac vice*)
NICOLLE B. BRITO
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
nbrito@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
THOMAS E. EGLER (189871)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
tome@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANA AVALOS CUELLAR
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
aavalos@rgrdlaw.com

Attorneys for Plaintiff

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR
JURY TRIAL - MDL Case No. 4:22-md-03047-YGR
4899-9761-9477.v1

- 38 -